Filed 4/23/14  Timmann v. Napoli CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SWARNAPALI TIMMANN, | B246687 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC324461) |
| v. | |
| JOHN F. NAPOLI et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Anthony Mohr, Judge.  Reversed in part, affirmed in part.

Law Offices of David M. Dushane and David M. Dushane for Plaintiff and Appellant.

Law Offices of Eric Y. Nishizawa and Eric Y. Nishizawa for Defendants and Respondents.

_____

## INTRODUCTION

Plaintiff Swarnapali Timmann (Plaintiff) appeals from the judgment entered in favor of Defendants John Napoli (Napoli), Kelly Berkline (Berkline), JFN Project Consultants, Inc., a California corporation (JFN Consultants), and JFN Project Consultants, Ltd., a United Kingdom corporation (JFN Limited) (collectively, Defendants). Judgment was entered for Defendants after Plaintiff's case was dismissed for failure to post a nonresident plaintiff bond pursuant to Code of Civil Procedure section 1030. We reverse the judgment, but affirm the discovery orders discussed later in this opinion.

Plaintiff is a citizen and resident of the United Kingdom. Pursuant to a forum selection clause in an investment agreement with JFN Consultants, Plaintiff sued Defendants in California state court, alleging, among other things, that Defendants breached the agreement by failing to make installment payments when due and failing to return Plaintiff's principal after she cancelled the agreement.

In this appeal, we are principally concerned with the trial court's order requiring Plaintiff to post a nonresident bond. To support their bond motion, Defendants relied exclusively upon evidence showing they offered to pay Plaintiff all money due under the investment agreement, but Plaintiff rejected the offer. Defendants argued this evidence established a reasonable possibility of obtaining judgment, because their offer of payment, and Plaintiff's rejection, purportedly extinguished the debt. The trial court agreed, and entered an order requiring Plaintiff to post a bond as security for the costs and attorney fees that might be awarded to Defendants. When Plaintiff failed to post the bond, the court dismissed the action and awarded Defendants over $250,000 for costs and attorney fees.

As we shall explain, Defendants' evidence was insufficient to establish a reasonable possibility of obtaining judgment as required to authorize a nonresident bond under Code of Civil Procedure section 1030. Though an offer to pay discharges the incidents of a debt, such as the accrual of interest (Civ. Code, § 1504), the debt is *extinguished* only if the amount owed "is immediately deposited in the name of the

2

creditor, with some bank or savings and loan association within this state, of good repute, and notice thereof is given to the creditor." (Civ. Code, § 1500.) This is the law regardless of whether the creditor rejects the offer of payment. Because Defendants' evidence showed only that an offer of payment was made, the evidence was insufficient to authorize an order requiring Plaintiff to post a nonresident bond.

## FACTS AND PROCEDURAL BACKGROUND

1. *The Investment Agreement*

On January 15, 2004, Plaintiff and JFN Consultants, by and through its chairman, Napoli, executed an "Inter-Party Private Agreement" (the Agreement), pursuant to which Plaintiff agreed to loan JFN Consultants £625,000 to fund a private transaction to create "certain medium and long term institutional quality notes issued by major international 'AA' and 'AAA' rated banks." In consideration for funding the transaction, JFN Consultants agreed to pay Plaintiff 11 monthly payments of £41,667 and one final lump sum payment of £666,667, commencing 30 days after Plaintiff wired the principal amount to a British bank account held in the name of JFN Limited.

The Agreement specifies the following remedy in the event of JFN Consultants' default: "IF *TIMMANN* HAS NOT RECEIVED PAYMENT WITHIN FIVE (5) BANKING DAYS, FROM THE END OF ANY THIRTY (30) DAY PERIOD, THEN *TIMMANN* MAY AT ITS [*sic*] SOLE DISCRETION CANCEL THIS AGREEMENT AND HAVE THEIR [*sic*] FUNDS RETURNED."

2. *Plaintiff Files Suit*

Upon executing the Agreement in January 2004, Plaintiff wire transferred £625,000 to JFN Limited's bank account in accordance with the Agreement's terms. JFN Consultants paid Plaintiff four monthly installment payments in February, March, April and May of 2004, but failed to make the June payment when due. Based on assurances by Napoli that the June payment would be forthcoming, Plaintiff elected not to cancel the Agreement. In July 2004, JFN Consultants again failed to make the monthly installment payment.

3

On July 19, 2004, Plaintiff elected to cancel the Agreement. Pursuant to the Agreement's terms, Plaintiff demanded the return of her £625,000 principal payment. Plaintiff also asserted she was owed two monthly installment payments, for June and July, totaling £83,334.

In response to her notice of cancellation, Plaintiff alleges Napoli demanded that she execute a "Debt Discharge Agreement" and "Non-Disclosure Agreement" and provide her "tax code" before he would authorize any payments. Subsequently, Plaintiff received a letter from Napoli's agent, Vince Rigano (Rigano), instructing Plaintiff to execute two copies of an enclosed Non-Disclosure Agreement. Rigano's letter allegedly stated, " 'Upon receipt of the signed Non-disclosure Agreement my client advises that payment of 708,334 pounds (principal and interest of 83,334 pounds) will be made.' " Plaintiff alleges she signed the Non-Disclosure Agreement, but did not receive the Debt Discharge Agreement or the payments offered in satisfaction of the sums owed under the Agreement.

In November 2004, Plaintiff filed this action against Defendants. While Plaintiff's civil case was pending in California state court, a parallel criminal investigation related to Plaintiff's transaction was commenced in the United Kingdom. In connection with those criminal proceeding, Plaintiff alleges Napoli, through his agents and associates, made death threats and false accusations of arson and assault against Plaintiff in the United Kingdom. The alleged death threats and criminal accusations led the British Metropolitan Police Service to place Plaintiff under police protection. Plaintiff alleges the conduct caused her to suffer severe and extreme emotional distress.

Based on the foregoing factual allegations, Plaintiff's operative fifth amended complaint asserts claims for breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, negligence, conversion, intentional infliction of emotional

distress, money had and received, unjust enrichment, alter ego liability and for a constructive trust.[1]

       3.    *Discovery Order Compelling Plaintiff's In-Person Deposition*

While the record is not entirely clear, it appears that at some point in late-2008, Plaintiff requested a protective order to have her deposition conducted by telephone or written questions to accommodate a purported mental illness that allegedly manifested as a result of Defendants' threats.[2] To support the request, Plaintiff presented reports from her general physician and a licensed consultant psychologist, both of whom diagnosed Plaintiff with anxiety/panic disorders and agoraphobia, and recommended against Plaintiff sitting for an in-person deposition.

The trial court entered an order staying the action for the stated purpose of obtaining "expert opinion . . . to assist the Court in determining the appropriate manner and method by which Plaintiff should give her deposition in this case." The order required Plaintiff to submit to an independent medical examination, pursuant to Evidence Code section 730, to be performed by a qualified psychiatrist or clinical psychologist, after which time the court would consider lifting the stay and making appropriate orders regarding Plaintiff's deposition. In the alternative, the order provided, "Plaintiff may sit for her deposition in person in England" and, upon completion of her deposition, "the stay . . . shall be lifted."

The trial court appointed Dr. Christopher Thompson, a licensed medical doctor and psychiatrist in the United Kingdom, to conduct the independent medical examination. The examination took place on September 7, 2009. Dr. Thompson diagnosed Plaintiff with "severe panic disorder, and depression," but found her symptoms did not meet the

---

[1]    Plaintiff failed to oppose Defendants' demur to the emotional distress claim, which was sustained with leave to amend. Plaintiff passed on the opportunity to amend and does not challenge the ruling sustaining the demurrer in this appeal.

[2]    Although Plaintiff refers to the request in her opening brief, no motion for protective order or record of any such request is included in her appellant's appendix or the reporter's transcript Plaintiff designated for this appeal.

criteria for agoraphobia, PTSD, OCD, or delusional illness.  He stated Plaintiff's mental illness would not make her testimony "inherently unreliable," but explained there was "sufficient cause to be concerned that if [Plaintiff] were required to make a deposition in person or by telephone she would be unable to state her case or respond to cross examination because of the speech problems that arise when she is stressed."  Thus, Dr. Thompson recommended that Plaintiff be allowed to "make a deposition in writing" as "an appropriate adjustment to her disability."

After receiving Dr. Thompson's report, the trial court held a hearing to consider Plaintiff's motion to lift the stay.  Addressing Plaintiff's deposition, the court stated it would be "unfair for [Defendants] to go to trial without having had the opportunity to talk to the Plaintiff."  The court added, "I know that there's been some psychological examinations and all; but if [Plaintiff] wants to go forward with this case, I think she's got some responsibilities that she's going to have to own up to at some point."

At the same hearing, Defendants presented a witness statement made by Plaintiff in the British criminal proceeding.  Plaintiff's statement, dated March 6, 2008, gave a factual account of her dealings with Napoli and JFN Consultants, and declared, "I am willing to attend Court and give evidence."

After reviewing the statement, the trial court noted an apparent discrepancy between assertions Plaintiff made about her mental health in the California proceeding, and her statement that she was "willing to attend Court and give evidence" in the British case.  Principally, the court recounted Plaintiff's earlier claim that she began seeing a doctor in October 2007 about purported symptoms of agoraphobia.  Contrasting those claims with Plaintiff's March 2008 statement, the trial court observed, "that undercuts her claims"  and "it looks to me as if she said one thing to a judge in the U.K. and another thing to a judge in California."

6

The trial court concluded, "the court now doubts [Plaintiff's] word and is not impressed with her credibility based on the statement she, herself, gave to the police in London." Thus, the court rejected Plaintiff's contention that mental illness precluded her from sitting for an in-person deposition, and ordered the stay lifted on the condition that "Plaintiff may engage in no discovery whatsoever against the Defendant[s] unless and until the Plaintiff has been deposed fully."

4. *Defendants' Motion for a Nonresident Bond*

On August 9, 2012, Defendants filed a motion to compel Plaintiff to post a nonresident bond pursuant to Code of Civil Procedure section 1030. To support the motion, Defendants relied exclusively upon a declaration by Napoli, stating that, in or around July 2004, he instructed JFN Consultant's accountant "to offer to pay the sum of £708,334.00, as full performance of the terms of the [A]greement," and that "[s]uch offer was made." Napoli also stated that JFN Consultants "requested that Plaintiff sign a debt discharge agreement . . . to confirm full performance," which Plaintiff refused to sign.

Based on Napoli's declaration, Defendants argued "[n]o breach of contract can exist and no failure to pay occurred[,] because [JFN Consultants] tendered performance of the Agreement," thereby extinguishing Defendants' contractual obligation. On this basis, Defendants argued they had established a reasonable possibility of obtaining judgment and, therefore, Plaintiff should be compelled to post a nonresident bond.

Plaintiff opposed the motion on the ground that Defendants' tender was insufficient because it failed to account for all monthly payments Plaintiff claimed she was entitled to under the Agreement. Plaintiff also argued Defendants were not entitled to prevailing party attorney fees under the terms of the Agreement.

On September 13, 2012, the trial court ordered Plaintiff to file an undertaking within 30 days in the amount of $40,000 to secure an award of costs and attorney fees that might be awarded to Defendants.

7

5.      *Dismissal for Failure to Post Nonresident Bond and Award of Attorney's Fees to Defendant*

On December 5, 2012, the trial court held a hearing on Defendants' motion to dismiss after Plaintiff failed to post the court ordered nonresident bond.  Plaintiff argued Defendants had failed to establish a reasonable possibility of prevailing on the breach of contract cause of action because the purported tender described in Napoli's declaration was not "full, complete and unconditional performance of the contract."  The trial court rejected the contention; observing, "It looks to me as if the defendants attempted tender, offered a tender, tried a tender before this case started."  The court concluded, "based on the record, there is a reasonable possibility they could prevail in this case."  The court dismissed Plaintiff's action for failure to post the bond.

At the same hearing, the trial court addressed Defendants' right to attorney fees under the Agreement.  Plaintiff argued the only provisions in the Agreement that mentioned attorney fees were indemnity provisions, which did not authorize prevailing party attorney fees.  The court rejected the contention, and ruled Defendants were entitled to attorney fees under the Agreement.

On March 21, 2013, the court entered judgment for Defendant, awarding Defendant $275,000 for attorney's fees and $5,692.43 for costs.

## DISCUSSION

1.      *The Evidence Was Insufficient to Authorize an Order Compelling Plaintiff to Post a Nonresident Bond*

      a.      *Code of Civil Procedure section 1030 requires evidence establishing a reasonable possibility defendant will obtain judgment in the action*

Code of Civil Procedure section 1030 authorizes the court to order a plaintiff to file an undertaking as security for a defendant's costs and attorney fees upon a showing that "the plaintiff resides out of the state or is a foreign corporation and that there is a reasonable possibility that the moving defendant will obtain judgment in the action or

special proceeding."[3] (Code Civ. Proc., § 1030, subd. (b).) The defendant's motion must "be accompanied by an affidavit in support of the grounds for the motion." (*Ibid.*) The statute thus requires the defendant to present evidence establishing a reasonable possibility of obtaining judgment in the action.

Plaintiff contends Defendants' evidence was insufficient to establish a reasonable possibility of obtaining judgment, particularly with respect to her breach of contract claim. In addressing a challenge to the sufficiency of evidence, "[t]his court's task is simply to determine whether any substantial evidence supports the trial court's determination." (*Baltayan v. Estate of Getemyan* (2001) 90 Cal.App.4th 1427, 1433.) We conclude substantial evidence was lacking in this case.

As discussed, Defendants relied exclusively upon Napoli's declaration to support their bond motion. Napoli's declaration states an offer was made to pay Plaintiff "the sum of £708,334.00 as full performance of the terms of the [A]greement," but Plaintiff rejected the offer by refusing to execute a debt discharge agreement. The declaration does not evidence that the funds were ever actually paid to Plaintiff to satisfy the contractual obligation. Nevertheless, in determining Defendants established a reasonable possibility of obtaining judgment, the trial court accepted Defendants' contention that evidence of the mere offer to pay was sufficient under Civil Code[4] section 1485 to

---

[3] Because the " 'purpose of [Code of Civil Procedure section 1030] is to enable a California resident sued by an out-of-state resident " 'to secure costs in light of the difficulty of enforcing a judgment for costs against a person who is not within the court's jurisdiction' " ' " (*Alshafie v. Lallande* (2009) 171 Cal.App.4th 421, 428), the statute requires evidence establishing "a reasonable possibility that the moving defendant will *obtain judgment in the action*." (Code Civ. Proc., § 1030, subd. (b), italics added.) Thus, relief is available under Code of Civil Procedure section 1030 only if the defendant's evidence establishes a reasonable possibility of prevailing on every claim plaintiff asserts in the action. (See, e.g., *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1199 [a plaintiff who prevails on only one of several causes of action is entitled to judgment and an award of costs].)

[4] Unless otherwise indicated, further statutory references are to the Civil Code.

9

extinguish the obligation to pay Plaintiff the money she was owed under the Agreement. This was error.

   b.  *An offer of payment, without deposit of the amount owed, does not extinguish a debt obligation*

  Section 1485 provides: "An obligation is extinguished by an offer of performance, *made in conformity to the rules herein prescribed*, and with intent to extinguish the obligation." (Italics added.) The "rules herein prescribed" refers to the rules set forth in Chapter 2 of the Civil Code, entitled "OFFER OF PERFORMANCE," consisting of sections 1485 through 1505. Thus, while section 1485 embodies the principle that one generally cannot be held liable for breach of an obligation that he or she stands willing and able to perform, it is the rules set forth in the latter sections of Chapter 2 that prescribe the requisites of the offer, including the actions that must be taken to extinguish the specific obligation.

  Because the obligation at issue is to pay money, section 1500 prescribes the governing rules for extinguishing the obligation. The statute provides: "An obligation for the payment of money is extinguished by a due offer of payment, if the amount is immediately deposited in the name of the creditor, with some bank or savings and loan association within this state, of good repute, and notice thereof is given to the creditor." (§ 1500.) Under section 1500, the "[m]ere failure to accept a tender does not discharge the obligation to pay money. [Citation.] An offer to pay extinguishes the obligation *only if the amount is deposited in the name of the creditor* (Civ. Code, § 1500), and such deposit must be unconditional, and so made that the deposit becomes at once the property of the creditor." (*Verdier v. Verdier* (1955) 133 Cal.App.2d 325, 333, italics added; see also *Walker v. Houston* (1932) 215 Cal. 742, 746 (*Walker*).) Courts applying section 1500 to circumstances where the plaintiff refused an otherwise valid tender of payment have uniformly reached the same conclusion. (See, e.g., *Bohnstedt v. Ballagh* (1958) 161 Cal.App.2d 109, 112 [trial court erred in failing to award judgment to plaintiff on ground defendant made sufficient tender, "for the tender, while sufficient to stop the running of interest (Civ. Code, § 1504) was not sufficient to extinguish respondent's

10

obligation to appellant, there having been no deposit of the fund to her credit"]; *Webb v. Jones* (1927) 88 Cal.App. 20, 29-30 [plaintiff had a "just cause of action" for the nonpayment of rent where, despite plaintiff's refusal of tender, defendant "did not attempt to extinguish the obligation by depositing the amount thereof to the credit of plaintiff and by giving the notice of the deposits as provided in section 1500 of the Civil Code. Therefore the debt was not extinguished by the tenders"].)

Defendants concede their tender of payment did not comply with section 1500. Nonetheless, Defendants argue their obligation to pay Plaintiff was discharged under section 1512 because Plaintiff frustrated their attempt to tender performance by refusing the tender and providing a "fake" tax identification number.[5] To support the contention, Defendants cite *Bruntz v. Alfaro* (1989) 212 Cal.App.3d 411 (*Bruntz*). Defendants' argument misconstrues the governing statutes and case law.

Section 1512 provides: "If the performance of an obligation be prevented by the creditor, the debtor is entitled to all the benefits which he would have obtained if it had been performed by both parties." As the case law applying the statute recognizes, section 1512 simply declares the fundamental principle that an obligor under a contract cannot be denied the benefits of *mutual performance* where the obligee breaches the contract by preventing the obligor from performing. (See *Buxbom v. Smith* (1944) 23 Cal.2d 535, 541.) Of course, as with any measure of contract damages, the costs the obligor would have incurred to perform must be taken into account in awarding "all the benefits which he would have obtained if [the contract] had been performed by *both parties*." (§ 1512,

---

[5] Defendants suggest a tax identification number was necessary to open a bank account in Plaintiff's name. Whether this assertion is true is beyond the scope of our review because there was no evidence presented with Defendants' bond motion to indicate Defendants attempted to open a bank account in Plaintiff's name but were thwarted by the "false" tax identification number she provided. Although Napoli's declaration states Defendants requested Plaintiff's tax identification, it says nothing about the specific purpose for the request. As best we can discern from the declaration, the tax identification number appears to have been requested in connection with Defendants' efforts to have Plaintiff sign the debt discharge agreement to confirm satisfaction of the debt—not to open a bank account to deposit the subject funds in Plaintiff's name.

11

italics added; see also § 3300.) Thus, in *Ahlers v. Smiley* (1912) 163 Cal. 200, our Supreme Court held that in view of section 1512 a seller under a supply contract was entitled to the lost *profits*—not revenues—it would have generated had the buyer not breached by purchasing from a different supplier. (*Ahlers,* at pp. 204-205; see also *Navarro v. Jeffries* (1960) 181 Cal.App.2d 454, 460-461 [affirming damages award for depreciated value of equipment where contract promised plaintiff "the opportunity to dispose of the specially purchased equipment upon completion of performance"].) The cases applying section 1512 do not hold, as Defendants suggest, that a creditor's rejection of the debtor's tender permits the debtor to retain the benefits of the creditor's performance—e.g., the lent funds—without accounting for the debtor's own cost of performance. In the case of an obligation to pay money, the debtor's cost of performance is the cost of repaying the debt.

Thus, where the obligation at issue is to pay money, the cases eschew the application of section 1512 advanced by Defendants, while recognizing that a debt is extinguished only by depositing the amount owed in accordance with section 1500. For instance, in *Rose v. Hecht* (1949) 94 Cal.App.2d 662, the court recognized that "[w]hile tenders of monthly rentals by personal checks without depositing in a bank the amount thereof to the lessor's credit *does not extinguish the obligation*, such tenders are sufficient to stop the running of interest" pursuant to section 1512. (*Rose,* at pp. 656-666, italics added.) The reason is manifest in the statutes' distinct mandates. Cessation of accruing interest is a *benefit* of performance to which the debtor is entitled upon tender of payment under section 1512. However, the ultimate *obligation* to pay the debt remains until the amount owed is actually paid to the creditor or deposited in the creditor's name as prescribed by section 1500.

This distinction was explained by our Supreme Court in *Walker* as follows: "*Tender is an offer of performance, not performance itself.* When unjustifiably refused, one of its effects is to place the other party in default, and permit the party making the tender to exercise his remedies for breach of contract. [Citation.] Another effect is specified in section 1504 of the Civil Code: 'An offer of payment or other performance, duly made, though the title to the thing offered be not transferred to the creditor, stops the running of interest on the obligation, and has the same effect upon all its incidents as a performance thereof.' In such a case, the obligation still remains, but all of its incidents are gone. . . . *The discharge of the incidents, however, does not affect the ultimate obligation, which, in the case of a debt, can only be discharged by either an actual payment to the creditor, or a deposit of the sum due in a bank in his name. . . . This is not tender, but actual performance. It discharges the obligation and not merely its incidents.*" (*Id.* at pp. 745-746, italics added, citing § 1500.)

*Bruntz, supra,* 212 Cal.App.3d 411 is in accord. After the plaintiff creditor in *Bruntz* commenced foreclosure proceedings pursuant to a note and deed of trust, the defendant debtors attempted to cure the alleged default and reinstate the loan in accordance with section 2924c, subdivision (a)(1), by tendering the sums demanded together with attorney fees as limited by section 2924c, subdivision (d).[6] The plaintiff refused the tender, asserting the attorney fee limitations did not apply in judicial

---

[6]     Section 2924c was amended several times since *Bruntz* was decided, but the amendments did not affect the provisions at issue in the case. As the court explained in *Bruntz*, "Subdivision (a)(1) of Civil Code section 2924c provides for reinstatement after default. In order to obtain reinstatement, a debtor must pay the entire amount then due under the deed of trust or mortgage (other than any accelerated portion), including reasonable costs and expenses subject to Civil Code section 2924c, subdivision (c), and trustee's or attorney's fees subject to Civil Code section 2924c, subdivision (d). If such payments are made, then 'all proceedings theretofore had or instituted shall be dismissed or discontinued and the obligation and deed of trust or mortgage shall be reinstated and shall be and remain in force and effect, the same as if no such acceleration occurred.' " (*Bruntz, supra,* 212 Cal.App.3d at pp. 419-420, quoting § 2924c, subd. (a)(1).)

13

foreclosure actions. The trial court disagreed and granted defendants' summary judgment motion. The Court of Appeal affirmed.

In affirming the judgment, the *Bruntz* court recognized, "When plaintiff brought the action for foreclosure, defendants were entitled, pursuant to Civil Code section 2924c, subdivision (a), to cure any alleged default and to reinstate the loan, and to obtain dismissal of the foreclosure action, by paying all amounts then due under the secured note with fees and costs as limited by subdivisions (c) and (d)." (*Bruntz, supra,* 212 Cal.App.3d at p. 423.) Because plaintiff wrongfully refused defendants' efforts to tender, the court held "defendants were entitled to the *incidents* and *benefits* of performance, including dismissal of the foreclosure action" pursuant to section 2924c. (*Bruntz,* at p. 423, italics added.) However, as the Supreme Court explained in *Walker*, relief from the incidents of a debt and entitlement to the benefits of performance does not affect the ultimate obligation to pay money owed to a creditor. (See *Walker, supra,* 215 Cal. at pp. 745-746.) In the case of a debt, that obligation "can only be discharged by either an actual payment to the creditor, or a deposit of the sum due in a bank in his name." (*Id.* at p. 746, citing § 1500.) *Bruntz* does not hold otherwise. Although the plaintiff in *Bruntz* was entitled to dismissal of the foreclosure action—a benefit prescribed by section 2924c—the court did not hold, as Defendants suggest, that the debt was extinguished by the mere offer to pay.

14

Here, the trial court determined Defendants had a reasonable possibility of obtaining judgment based solely on evidence of Defendants' offer to pay Plaintiff the amount she was owed under the Agreement.[7]  This tender, absent evidence showing Defendants deposited the amount owed in an account in Plaintiff's name as prescribed by section 1500, was insufficient to establish a reasonable possibility of obtaining judgment. Accordingly, the trial court was not authorized to order Plaintiff to post a nonresident bond pursuant to Code of Civil Procedure section 1030.  Because the dismissal of Plaintiff's action was predicated on Plaintiff's failure to post the erroneously ordered bond, we reverse the judgment.

2.     *Prevailing Party Attorney Fees Are Not Authorized by the Agreement*

Though our reversal of the judgment effectively reverses the prevailing party attorney fee award, for the sake of efficiency we will address Plaintiff's contention that attorney fees are not authorized by the Agreement.

---

[7]     Plaintiff challenges Defendants' tender on the ground the amount offered did not include all monthly payments promised in the Agreement.  The argument is inconsistent with the Agreement's terms.  In the event Defendants failed to make a monthly payment when due, the Agreement granted Plaintiff the right to "CANCEL THIS AGREEMENT AND HAVE THEIR [*sic*] FUNDS RETURNED."  In her complaint, Plaintiff alleges she elected to cancel the Agreement after Defendants failed to make two monthly payments totaling £83,334.  Napoli's declaration shows Defendants offered Plaintiff £708,334, consisting of Plaintiff's £625,000 principal deposit plus the two monthly payments totaling £83,334 that were then due.  The amount of Defendants' tender was consistent with their obligation under the Agreement.

Plaintiff also argues Defendants' tender was deficient because payment was contingent on her first executing a debt discharge agreement and providing her tax identification number.  There is some merit to this argument insofar as "[a]n offer of performance must be free from any conditions which the creditor is not bound, on his part, to perform."  (§ 1494.)  However, it is not clear from the record whether Plaintiff objected to the tender on this basis when it was made.  (See § 1501 [objections to the mode of an offer of performance, which the creditor has an opportunity to state at the time offer is made, are waived if not then stated by the creditor].)  Accordingly, a factual dispute may exist as to the tender's validity.  We make these observations to provide guidance on remand, as the validity of the tender may impact the accrual of interest. (See § 1504.)

15

Because the trial court interpreted the purported attorney fee provision without resorting to extrinsic evidence, "we apply de novo review, exercising our independent judgment in interpreting the clause without giving any deference to the trial court's ruling." (*Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336.) "Under Civil Code section 1717, a reciprocal right to attorney fees in all parties to a contract arises where the contract accords a right to such fees to one party but not the other. [Citation.] However, the inclusion of attorney fees as an item of loss in a third party claim indemnity provision does not constitute a provision for the award of attorney fees in an action on contract as is required to trigger operation of Civil Code section 1717. [Citations.] Regardless whether [the] clause is characterized as an indemnification or an attorney fees provision, the usual rules of construing a contract govern our interpretation, as we strive to determine the actual intent of the parties." (*Id.* at pp. 1336-1337.)

The trial court held prevailing party attorney fees were authorized by section 1, subparagraph F of the Agreement. Section 1 is titled "NON-DISCLOSURE AND NON-USE OBLIGATIONS." The section acknowledges the parties will exchange "Confidential Information" and prohibits the "Receiving Party" from disseminating the "Disclosing Party's" Confidential Information to third parties or otherwise making use of the information, except as authorized by the Disclosing Party.

Subparagraph F, under the heading "INDEMNIFICATION AND ACCOUNTING," states: "The Receiving Party agrees to indemnify and hold harmless the Disclosing Party from and against all claims, losses, liabilities, damages, expenses, and costs (including, without limitation, reasonable attorneys' fees, expert witness and court costs) which result from a breach or threatened breach of this Agreement. The Receiving Party agrees that if it breaches this Agreement, the Disclosing Party shall be entitled to an accounting, and payment of all forms of compensation or benefits that the Receiving Party directly or indirectly realizes as a result of such violation. Such remedy shall be in addition to any injunctive relief or other remedies to which the Disclosing Party may be entitled at law or in equity."

16

Defendants contend the reference to "a breach or threatened breach of *this Agreement*" establishes that the clause applies to any claim made on the Agreement as a whole, not only the non-disclosure provisions. (Italics added.) We disagree. To begin, the clause grants an indemnity right to the Disclosing Party against the Receiving Party—parties whose status is defined entirely by the exchange of Confidential Information and whose rights and obligations are limited to those specified in the Agreement's NON-DISCLOSURE AND NON-USE OBLIGATIONS section. Further, the second sentence of subparagraph F belies Defendants' contention that the attorney fee provision in the first sentence applies to the entire Agreement. Like the first sentence, the second sentence refers to "breaches of *this Agreement*," and provides that the Disclosing Party shall be entitled to all compensation or benefits the Receiving Party "directly or indirectly realizes as a result of such violation." Notwithstanding the reference to "this Agreement," the remedy provided by the second sentence logically relates exclusively to the non-disclosure section's prohibition against the Receiving Party making unauthorized use of the Disclosing Party's Confidential Information—no other breach of the Agreement would result in the Receiving Party directly or indirectly receiving compensation. The same is true of the non-disclosure section's injunctive relief provision. That provision states: "[I]n the event of a breach of *this Agreement*, including without limitation, the actual or threatened disclosure or unauthorized use of the Disclosing Party's Confidential Information, . . . the Disclosing Party shall be entitled to injunctive relief and/or a decree for specific performance . . . ." (Italics added.) Injunctive relief and specific performance are remedies that exclusively relate to the Agreement's non-disclosure obligations.

Accordingly, we conclude subparagraph F, read as a whole and in context, is an indemnification clause that authorizes a claim for reimbursement of attorney fees incurred in connection with enforcing the Agreement's non-disclosure obligations. It does not authorize prevailing party attorney fees on the claims asserted in this action.

3.      *The Order Compelling Plaintiff's Deposition Was Not an Abuse of Discretion*

Plaintiff challenges the trial court's orders requiring her to sit for an in-person deposition.  Plaintiff contends there was no evidence to contradict the court appointed expert's recommendation to allow Plaintiff's deposition in writing and the trial court erred as a matter of law by refusing to order the accommodation.  We disagree.

" 'Management of discovery generally lies within the sound discretion of the trial court.' " (*Maldonado v. Superior Court* (2002) 94 Cal.App.4th 1390, 1396.)  "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.)  "Even though contrary findings *could* have been made, an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict." (*Ibid.*)  Where the trial court's determination of the facts supports its decision, there is no abuse of discretion.  (*Ibid.*)

Contrary to Plaintiff's premise, the trial court made a factual finding from conflicting evidence concerning Plaintiff's capacity to testify in-person.  Principally, Plaintiff's witness statement, made under oath in connection with the British criminal proceeding, evidenced Plaintiff's capacity to "attend Court and give evidence" as recently as March 2008.  Contrasted with Plaintiff's statements in this action that she suffered from agoraphobia in October 2007, there was sufficient evidence for the court to find Plaintiff had been dishonest about her mental condition, and to reject the court appointed expert's recommendation.  On this record, we cannot say the trial court abused its discretion.

18

## DISPOSITION

The judgment is reversed and the order requiring Plaintiff to post a nonresident plaintiff bond is vacated.  The discovery orders are affirmed.  In the interest of justice, Plaintiff is awarded her costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


         KITCHING, J.

We concur:


   KLEIN, P. J.


   CROSKEY, J.

19